**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division**

| | |
|---|---|
| BEYOND SYSTEMS, INC. | * |
| Plaintiff | * |
| | * |
| v. | *    **DKC-05-CV-2446** |
| | * |
| KENNEDY WESTERN UNIVERSITY, et al. | * |
| | * |
| Defendants | * |

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS COMPLAINT**

Plaintiff, Beyond Systems, Inc., through counsel, Stephen H. Ring, P.C., opposes the

Motion to Dismiss Complaint filed by Defendants Kennedy Western University, Kennedy-

Western University, KWU Acquisition, Inc., Kennedy-Western Educational Corp., and Kennedy-

Western University, LLC (collectively, "KWU").

## I.  Overview

The Motion, which seeks dismissal under Federal Rules of Civil Procedure 12(b)(2) and

12(b)(6), argues lack of personal jurisdiction, preemption by the federal CAN-SPAM Act (15

USC §7701), and unconstitutionality of MCEMA.[1]  The Motion is accompanied by a

memorandum, an "Exhibit A," consisting of a single page printout from the Internet, and a

declaration of Robert Patterson accompanied by five pages entitled "Kennedy-Western

University Campaign Guidelines-2004."

Plaintiff counters that the allegations of fact and supplemental materials already provide

the necessary prima facie showing for personal jurisdiction; that in any event plaintiff is entitled

---

[1] §14-3001 et seq. of the Commercial Law Article of the Annotated Code of Maryland,
the Maryland Commercial Electronic Mail Act, the statute on which this suit is based.

to jurisdictional discovery before any determination on personal jurisdiction; that CAN-SPAM does not preempt the fraud and deceptive conduct provisions of MCEMA on which this suit is based; and that MCEMA passes constitutional muster under both the dormant commerce clause and the standards regarding vagueness.

This opposition contains the following sections:

I.      Standard of Review for Motions to Dismiss                    Page 2

II.      Personal Jurisdiction Via the Internet                       Page 3

III.     Plaintiff's Entitlement to Jurisdictional Discovery          Page 15

IV.     Allegations in Complaint                                     Page 19

V.      Supplemental Facts (A.  From Defendants; B.  From Plaintiff)  Page 21

VI.     CAN-SPAM does not preempt MCEMA.                             Page 26

VII.    Constitutionality - Dormant Commerce Clause; Vagueness       Page 27

VIII.   Conclusion.                                                  Page 40

**I.  Standard of Review for Motions to Dismiss**

Where the Court addresses a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction on the basis of motion papers, supporting legal memoranda and the relevant allegations of a complaint, without a hearing, the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis in order to survive the jurisdictional challenge.  Combs v. Bakker, 886 F. 2d 673, 676 (4th Cir., 1989); America OnLine v. Huang, 106 F. Supp. 2d 848, 852 (E.D. Va. 2000), n. 6.  In resolving this issue, a court must construe all relevant allegations in the light most favorable to the plaintiff and draw the most favorable inferences for the existence of jurisdiction.  Combs, 886 F. 2d at 676.  When jurisdiction turns on

a disputed fact, the court may in its discretion hold an evidentiary hearing.  As a general matter, when jurisdictional facts are inextricably intertwined with underlying claims, the proper course is to resolve the issue by proceeding on the merits.  Raymond Colesar Glaspy & Huss, P.C. v. Allied Capital Corp., 761 F. Supp. 423, 429 (E.D. Va. 1991) (citing Carter v. Trafalgar Tours, Ltd. 704 F. Supp. 673, 674 n.2 (W.D. Va. 1989)).

In reviewing a Rule 12(b)(6) motion to dismiss, the Court accepts the Amended Complaint's factual allegations as true and considers the Amended Complaint and its allegations in the light most favorable to the non-moving party. See Mylan Lab., Inc. v. Matkari, 7 F.3d 1130, 1134 (4_h Cir. 1993). Courts generally view motions to dismiss via Federal Rule of Civil Procedure 12 (b)(6) with disfavor. See 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, 1356 (2d ed. 1990).  Therefore, the Court does not grant a motion to dismiss for failure to state a claim unless it appears to a certainty that the plaintiff cannot prove any set of facts in support of its claim which would entitle it to relief. See Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

## II.  Personal Jurisdiction via the Internet.

### a.  Internet as Exclusive Medium.

Defendant's activities must be considered in the context that all of its business operations are conducted via the Internet.  The Internet is not simply an auxiliary means of boosting business; it is the forum for KWU's operations.  KWU prides itself on being one of the first, and one of the largest, Internet based universities.  Because all of their activity is based on the Internet, and they enjoy certain obvious benefits (low overhead, and universal geographic reach, for example), there are some trade-offs, such as being subject to the laws of the states in which

KWU conducts business.  If KWU insists on using the tremendous reach and efficiencies of the Internet as its backbone, it must be willing to submit to the laws of the states into which it so efficiently reaches.  KWU can clearly exclude states at will (see Exhibit 17).  If KWU wants to avoid being "haled" into the courts of a state, it can exclude that state from its realm of business.

### b.  Maryland Long-Arm Statute

The analysis of personal jurisdiction via email begins with the Maryland "Long-Arm" Statute, §6-103, Courts and Judicial Proceedings Article, Annotated Code of Maryland:

(a)     If jurisdiction over a person is based solely upon this section, he may be sued only on a cause of action arising from any act enumerated in this section.

(b)     A court may exercise personal jurisdiction over a person, who **directly or by an agent**:

(1)     Transacts any business or performs any character of work or service in the State;

(2)     Contracts to supply goods, food, services, or manufactured products in the State;

(3)     Causes tortious injury in the State by an act or omission in the State;

(4)     Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;

(5)     Has an interest in, uses, or possesses real property in the State; or

(6)     Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

(c)(1)(i)     In this subsection the following terms have the meanings indicated.

4

(ii)     "Computer information" has the meaning stated in § 22-102 of the Commercial Law Article.

(iii)     "Computer program" has the meaning stated in § 22-102 of the Commercial Law Article.

(2)     The provisions of this section **apply to computer information and computer programs** in the same manner as they apply to goods and services.

[Emphasis added.]

Thus, acts by an agent may create personal jurisdiction over a defendant, and conduct via computer counts as any other conduct for purposes of personal jursidiction.  The additional Code references in subsection (c)(1)(i) above are the following:

Commercial Law Article, §22-102:

*        *        *

(9) "Computer" means an electronic device that accepts information in digital or similar form and manipulates it for a result based on a sequence of instructions.

(10) "Computer information" means information in electronic form which is obtained from or through the use of a computer or which is in a form capable of being processed by a computer.  The term includes a copy of the information and any documentation or packaging associated with the copy.

Thus, §6-103(c)(2) contemplates that conduct via computer and "computer information" (which includes email as "information electronic form . . .") shall be considered "in the same manner as . . . goods and services."  As the Court of Appeal has recently stated,  ". . . conducting business in Maryland that involves supplying computer programs or information to Maryland residents will be treated in the same manner as if the programs and information were tangible goods or services provided by a business.  Advertising the software at issue may form the basis

5

of personal jurisdiction under the Maryland long arm statute based upon the definition of
"computer program."  Beyond Systems, Inc. v Realtime Gaming Holding Co. LLC, 388 Md. 1,
4, 878 A.2d 567 (August 8, 2005).[2]

The purpose of the Maryland long-arm statute was to extend the scope of jurisdiction
over nonresident defendants to the limits of the Fourteenth Amendment's Due Process Clause as
declared by the United States Supreme Court. Curtis v. State, 284 Md. 132 (1978); Potomac
Design, Inc. v. Auricle Trading, Inc., 839 F. Supp. 364 (D. Md. 1993). The reach of the statute,
therefore, depends largely upon whether Maryland in personam jurisdiction may be asserted
under the Fourteenth Amendment. Leather Masters, Ltd. v. Giampier, Ltd., 836 F. Supp. (D. Md.
1993).

### c. Maryland Commercial Electronic Mail Act.

The statute that creates the cause of action in this suit (§14-3001, et seq. of the
Commercial Law Article of the Annotated Code of Maryland, also known as the Maryland
Commercial Electronic Mail Act, or MCEMA) provides in relevant part:

> (a)  In this subtitle the following words have the meanings indicated.
>
> (b) (1)  "Commercial electronic mail" means electronic mail that
> advertises real property, goods, or services for sale or lease.
>
>     \*       \*       \*
>
> (c) (1)  "Interactive computer service provider" means an
> information service, system, or access software provider that
> provides or enables computer access by multiple users to a computer

---

[2] In Realtime Gaming, another MCEMA suit, the Court of Appeals found lack of personal
jurisdiction due to inadequate evidence of the identity of the sender of the emails beneath a
welter of corporate entities, some of them offshore.  That problem is not present here.

service.

(2)  "Interactive computer service provider" includes a service or system that provides access to the internet and systems operated or services offered by a library or educational institution.

§14-3002.

(a)  This section does not apply to an interactive computer service provider or a telecommunication utility to the extent that the interactive computer service provider or the telecommunication utility merely handles, retransmits, or carries a transmission of commercial electronic mail.

(b)  **A person may not initiate the transmission, conspire with another person to initiate the transmission, or assist in the transmission of commercial electronic mail that**:

(1)  is from a computer in the state or **is sent to an electronic mail address that the sender knows or should have known is held by      a resident of the state**; and

(2) (i)  uses a third party's internet domain name or electronic mail address without the permission of the third party;

     **(ii)  contains false or misleading information about the origin or the transmission path of the commercial electronic mail; or**

     **(iii)  contains false or misleading information in the subject line that has the capacity, tendency, or effect of deceiving the recipient.**

(c)  **a person is presumed to know that the intended recipient of commercial electronic mail is a resident of the state if the information is available on request from the registrant of the internet domain name contained in the recipient's electronic mail address**.

*       *       *

§14-3003.

A person who violates this subtitle is liable for reasonable attorney's fees and for damages:

(1) to the recipient of commercial electronic mail, in an amount equal to the greater of $500 or the recipient's actual damages;

(2) to the third party without whose permission the third party's internet domain name or electronic mail address was used, in an amount equal to the greater of $500 or the third party's actual damages; and

(3) to an interactive computer service provider, in an amount equal to the greater of $1,000 or the interactive computer service provider's actual damages.

[Emphasis added.]

Thus, MCEMA imposes liability not only on those who "initiate" the transmission of the offending email, but those who "conspire" with others to initiate the transmission, or who "assist" in the transmission.

### d. Standards for Specific and General Personal Jurisdiction

The standard for determining the existence of personal jurisdiction over a nonresident defendant varies, depending on whether the defendant's contacts with the forum state also provide the basis for the suit.  If those contacts form the basis for the suit, they may establish "specific jurisdiction."  In determining whether specific jurisdiction exists, the court considers (1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the Petitioners' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally "reasonable." ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 711-12 (4th Cir. 2002), *cert. denied*, 123 S. Ct. 868 (2003); *see* Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 & n.8 (1984).

If the defendant's contacts with the state are not also the basis for the suit, then

jurisdiction over the defendant must arise from the defendant's general, more persistent, but unrelated contacts with the state.  To establish general jurisdiction, the defendant's activities in the state must have been "continuous and systematic." <u>ALS Scan</u>, 293 F.3d at 712; *see* <u>Helicopteros</u>, 466 U.S. at 414 & n.9.

### e. Personal Jurisdiction via the Internet; Zippo, etc.

A State may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) directs electronic activity into the Sate, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts.  <u>ALS Scan,</u> 293 F.3d at 713; <u>Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.</u>, 334 F.3d 390, 397 (4th Cir. 2003).

<u>ALS Scan</u> and <u>Carefirst</u> both rely on the seminal case of <u>Zippo Manufacturing Company v. Zippo Dot Com, Inc.</u>, 952 F. Supp. 1119 (W. D. Pa., Jan 16, 1997).[3]  In <u>Zippo</u>, a manufacturer of tobacco lighters having its principal place of business in Pennsylvania sued an Internet subscription news service ("Dot Com;" providing a service that exists solely for use over the Internet) having its principal place of business in California, for trademark infringement and dilution arising out of Defendant's use of the domain names "zippo.com", "zippo.net" and "zipponews.com" on the Internet. The court noted that Defendant's contacts with Pennsylvania

> [O]ccurred almost exclusively over the Internet. Dot Com's offices, employees and Internet servers are located in California. Dot Com maintains no offices,

---

[3] <u>ALS Scan</u> and <u>Carefirst</u> both found no personal jurisdiction.  Nevertheless, the analysis in those cases compels a finding of jurisdiction in the instant case, involving far different facts. Most notably, the instant case is based on the transmission of emails, a far more directed and purposeful act than the mere posting of information on a website.

employees or agents in Pennsylvania. Dot Com's advertising for its service to
Pennsylvania residents involves posting information about its service on its Web
page, which is accessible to Pennsylvania residents via the Internet. Defendant has
approximately 140,000 paying subscribers worldwide. Approximately <u>two percent</u>
(3,000) of those subscribers are Pennsylvania residents. These subscribers have
contracted to receive Dot Com's service by visiting its Web site and filling out the
application. Additionally, Dot Com has entered into agreements with seven
Internet access providers in Pennsylvania to permit their subscribers to access Dot
Com's news service. Two of these providers are located in the Western District of
Pennsylvania."

952 F.Supp. 1124    [Emphasis added.]

The court in <u>Zippo</u> described a "sliding scale" for the exercise of personal jurisdiction

based upon Internet contacts. At one end of the spectrum are situations where a defendant clearly

does business over the Internet. If the defendant enters into contracts with residents of a foreign

jurisdiction that involve the knowing and repeated transmission of computer files over the

Internet, personal jurisdiction is proper, as in <u>Compuserve, Inc. v. Patterson</u>, 89 F.2d 1257 (6th

Cir.1996). At the opposite end are situations where a defendant has simply posted information on

an Internet Web site which is accessible to users in foreign jurisdictions. This is not grounds for

the exercise of personal jurisdiction. E.g. <u>Bensusan Restaurant Corp., v. King</u>, 937 F.Supp. 296

(S.D.N.Y.1996). The middle ground is occupied by interactive Web sites where a user can

exchange information with the host computer. In these cases, the exercise of jurisdiction is

determined by examining the level of interactivity and commercial nature of the exchange of

information that occurs on the Website.  The court found that personal jurisdiction was proper in

<u>Zippo</u> because the Defendant

> [H]as done more than create an interactive Web site through which it exchanges
> information with Pennsylvania residents in hopes of using that information for
> commercial gain later. We are not being asked to determine whether Dot Com's
> Web site alone constitutes the purposeful availment of doing business in
> Pennsylvania. This is a "doing business over the Internet" case in the line of

10

Compuserve, supra. We are being asked to determine whether Dot Com's
conducting of electronic commerce with Pennsylvania residents constitutes the
purposeful availment of doing business in Pennsylvania. We conclude that it does.
Dot Com has contracted with approximately 3,000 individuals and seven Internet
access providers in Pennsylvania. The intended object of these transactions has
been the downloading of the electronic messages that form the basis of this suit in
Pennsylvania."

952 F.Supp. 1126

The analysis must not simply focus on the number, but the "quality and nature" of the

contacts. Carefirst, supra, 334 F. 2d at 397; Nichols v. G. D. Searle & Co., 783 F. Supp. 233,

238 (D. Md. 1992), aff'd 991 F. 2d 1195 (4th cir. 1993). The court should not merely "count the

contacts and quantitatively compare this case to other preceding cases." Id. "Even a single

contact may be sufficient to create jurisdiction when the cause of action arises out of that single

contact, provided that the principle of "fair play and substantial justice" is not thereby offended.

Id. (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477-78 (1985); see McGee v.

International Life Ins. Co., 355 U.S. 220, 223-24 (1957); Carefirst, supra, at 398.

In Carefirst, the services involved were health care, provided primarily in person and not

via the Internet (unlike here). The Web site was merely supplemental to the primary business

and the contacts with Maryland were few and merely incidental. There was no evidence the

contacts were "expressly aimed" at Maryland.

The Carefirst court considered whether the defendant acted with the "manifest intent" of

targeting Marylanders," 334 F. 2d at 400, finding, first, that the semi-interactive website resulted

in only one confirmed online exchange with a Maryland resident, and that was a donation by

plaintiff's counsel "ostensibly made to bolster the position of her client in this litigation." Id.

Second, the Court found the defendant's website, though accessible in Maryland, to be of a

11

"strongly local character" (in Chicago). Id.   The court concluded that the defendant did not direct electronic activity into Maryland "with the manifest intent of engaging in business or other interactions within that state in particular.  See ESAB Group, 126 F. 3d at 625-36. . ."  Id.

In ALS Scan, supra, the owner of copyrighted photographs sued a nonresident ISP for displaying them on a website.  The court found that this mere passive display of the material was insufficient to establish personal jurisdiction in the plaintiff's state.

A comprehensive analysis of personal jurisdiction via the Internet is found in Verizon v. Ralsky, 203 F. Supp. 2d 601, 2002 U.S. Dist. LEXIS 10224 (D.C. Va. 2002), finding personal jurisdiction over a spammer in Michigan who, in an alleged conspiracy[4] with 100 "John Does," caused millions of unsolicited bulk e-mails ("UBE's") to be transmitted to and through Verizon's e-mail servers in Viriginia.  Ralsky gives a poignant description of the Internet, e-mail, and the application of the law concerning personal jurisdiction to this modern communications technology.  Key factors supporting personal jurisdiction in this context are whether the electronic communications were for pecuniary gain, and whether they caused tortious or statutory harm within the forum state.  Defendants "should not be permitted to take advantage of modern technology via the Internet or other electronic means to escape traditional notions of jurisdiction," citing Cybersell, Inc. v. Cybersell, Inc. et al., 1997 US LEXIS App. 33871, 130 F.3d 414, 419 (9th Cir. 1997);  Ralsky, 203 F. Supp. 2d at 605.

---

[4] "When co-conspirators have sufficient contacts with the forum, so that due process would not be violated, it is imputed against the 'foreign' co-conspirators who allege there is [sic] not sufficient contacts; co-conspirators are agents for each other." Ethanol Partners Accredited v. Wiener, Zuckerbrot, Weiss & Brecher, 635 F. Supp. 15, 18 (E.D. Pa. 1995), cited in Ralsky, 203 F. Supp at 615.

In <u>Bunn-O-Matic Corp. v. Bunn Coffee Service Inc.,</u> 1998 U.S. Dist. LEXIS 7819; 46

U.S.P.Q.2D (BNA) 1375 (C.D. IL 1998), a suit for trademark infringement, even a passive

website was found sufficient to create personal jurisdiction.  Defendant's website, accessible

throughout the country, presented information and offered a contest to win free coffee, but no

forum state residents did so.  There were no other contacts with the forum state. Defendant

moved to dismiss for lack of personam jurisdiction. The court applied the Illinois long arm

statute,  and concluded that asserting jurisdiction over the Defendant would not violate the

federal constitutional limits.

> "It is . . .  clear that  the state in which a victim of a tort suffers the injury may
> exercise personal jurisdiction over the alleged tortfeasor. <u>Janmark, Inc. v. Reidy,</u>
> 132 F.3d 1200, 1202 (7th Cir. 1997) (noting that "there can be no serious doubt . .
> . that the state in which the victim of a tort suffers the injury may entertain a suit
> against the accused tortfeasor") (citing <u>Calder v. Jones,</u> 465 U.S. 783, 79 L. Ed. 2d
> 804, 104 S. Ct. 1482 (1984)).

1998 U.S. Dist. LEXIS 7824

The defendant had argued that some form of actual "entry" in the jurisdiction was required before

jurisdiction could be asserted. The court found that Defendant's "passive" website, accessible to

residents of Illinois, satisfied this "very low 'entry' threshhold."

Personal jurisdiction was found to exist in Ohio over an Internet user in Texas who

subscribed to an Ohio-based network service.  <u>CompuServe, Inc. v. Patterson</u>, 89 F.3d 1257 (6th

Cir. 1996).  The user "specifically targeted" Ohio by subscribing to the service and entering into a

separate agreement with the service to sell his software over the Internet. The Court found that

the user "reached out" from Texas to Ohio and "originated and maintained" contacts with Ohio.

In <u>Inset Systems, Inc. v. Instruction Set, Inc.,</u> 937 F. Supp. 161 (D. Conn. 1996) personal

jurisdiction existed over a defendant whose only contacts with Connecticut were an Internet web

13

site and an 800 telephone number, both accessible generally to the world.  Similarly, in <u>Maritz,</u> <u>Inc. v. CyberGold, Inc.</u>, 947 F. Supp. 1328 (E. D. Mo. 1996) the court sustained the exercise of personal jurisdiction over a defendant whose only contact with Missouri was a web site "published" on a computer in California that "provided information about CyberGold's new upcoming [Internet] service."  The court noted that the defendant's web site was accessible to any Internet user, including those in Missouri, and in fact had been accessed by people in Missouri.

In <u>Resuscitation Technologies, Inc. v. Continental Health Care Corp.</u>, 1997 U.S. Dist. LEXIS 3523 (S.D. Ind. 1997) Plaintiff solicited investors in a start-up via a website, precipitating a series of communications via telephone, regular mail, and some 80 email messages.  The court found that "the intended object of the contacts by [defendant] with [plaintiff] and with the State of Indiana were to transact business in Indiana."  The "footfalls" in the forum state were not physical, but electronic.

A number of state courts have found personal jurisdiction via the Internet.  See, e.g. <u>Minnesota v. Granite Gates Resorts, Inc.</u>, 568 NW 2d 715 (Minn. Ct. App. 1997) (gambling website advertisements demonstrated "clear intent to solicit business from markets that include Minnesota" and resulted in multiple contacts with Minnesota residents, including at least one successful solicitation;" specific personal jurisdiction was found.);  <u>Fenn v.  Mleads</u>, 103 P3d 156 (Utah App 2004) (single email was adequate to create long-arm specific personal jurisdiction defendant's sole contact with the state was to employ an agent who sent one unsolicited commercial email to a resident of Utah. . . ." applying  <u>Burger King</u> and related federal cases)

The multiple emails sent in this case, in combination with the interactive Web sites that

solicit and take orders, stand in contrast with the minimal contacts in Carefirst and ALS Scan, and are more than sufficient for both specific jurisdiction and general jurisdiction.

Specific jurisdiction exists because more than 1,000 emails were targeted to specific email addresses belonging to Plaintiff, a Maryland recipient,[5] with the clear intent of "driving traffic"or directing a Maryland prospect to a Web site for sales purposes.  (As noted above, the sender is presumed by statute to know that the email addresses belong to persons in Maryland.) This scenario clearly demonstrates purposeful availment of the privilege of conducting activities in the state, and "transacting business" within the state.

General jurisdiction exists by virtue of persistent, continuous and systematic conduct in the sending of the emails, in contacts via students and faculty, and in numerous ongoing solicitations of business in Maryland.  KWU's website activity is near the interactive end of the sliding scale in Zippo.

### III.  Plaintiff's Entitlement to Jurisdictional Discovery

When a non-resident defendant files a motion pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure challenging the court's power to exercise personal jurisdiction, "the jurisdictional question thus raised is one for the judge, with the burden on the plaintiff **ultimately** to prove the existence of a ground for jurisdiction by a preponderance of the evidence." Combs v. Bakker, 886 F.2d 673, 676 (4th Cir.1989) (citation omitted) [Emphasis added.]  However, when the court rules on the motion based solely on the complaint and affidavits and does not hold an

---

[5] In considering "targeted activity" as a test for personal jurisdiction, the courts clearly do not mean activity directed exclusively at a particular state.  From the cases reviewed, it is clear that one may engage in targeted activity directed at many states at the same time.

evidentiary hearing or **wait** until evidence relevant to the jurisdictional issue is presented at trial, "'the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis in order to survive the jurisdictional challenge.'" In re Celotex Corp. 124 F.3d 619, 628 (4th Cir. 1997) (quoting Combs, 886 F.2d at 676) [Emphasis added.]. Under these circumstances, "the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Combs*, 886 F.2d at 676.

Implicit in the phrase, "or wait until evidence relevant to the jurisdiction issue is presented at trial," is the expectation that a fair opportunity for discovery would have been allowed, to provide the "evidence" for which the "wait" was justified.  The Combs standard should control here.

In Toys R Us v. Step Two SA, 318 F.3d 446 (3d Cir. 2003), a unanimous three-judge panel found the district court had erred in denying the plaintiff's request for jurisdictional discovery: "Toys' request for jurisdictional discovery was specific, non-frivolous, and a logical follow-up based on the information known to Toys.  The District Court erred by denying this reasonable request."  Id., at 452.

A plaintiff bears no affirmative duty to plead personal jurisdiction in a complaint, and it is inappropriate ordinarily to grant a motion to dismiss based solely on the pleadings and to deny discovery on the issue of amenability to suit.  *See, e.g.*, *Edmond v. United States Postal Serv. Gen. Counsel*, 953 F.2d 1398, 1401 (D.C. Cir. 1992) (Ginsberg, J., concurring); *Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A. D'Assurances*, 723 F.2d 357, 362 (3rd Cir. 1983);

*Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1343 (2d Cir. 1972); *Surpitski v. Hughes-Keenan Corp.*, 362 F.2d 254, 255-56 (1st Cir. 1966); *Hart Holding Co. Inc. v. Drexel Burnham Lambert, Inc.*, 593 A.2d 535, 538 (Del. Ch. 1991); *Peterson v. Spartan Indus., Inc.*, 310 N.E.2d 513, 516 (N.Y. 1974).

In *Edmond*, then-Circuit Judge Ruth Bader Ginsburg noted the importance of affording a plaintiff "ample opportunity" to take discovery relevant to personal jurisdiction before dismissing a claim against a defendant:

> The ruling on personal jurisdiction over Popkin was premature in the absence of any discovery; in keeping with *Naartex* [*Consulting Corp. v. Watt*, 722 F.2d 779 (D.C. Cir. 1983), *cert. denied sub nom.  Naartex Consulting Corp. v. Clark*, 467 U.S. 1210, 104 S. Ct. 2399, 81 L. Ed. 2d 355 (1984)], that ruling should have abided a fair opportunity for plaintiffs to pursue discovery keyed to the issue of personal jurisdiction.
>
> 953 F.2d 1398 at 1401.

In *Surpitksi*, the United States Court of Appeals for the First Circuit noted:

> A plaintiff who is a total stranger to a corporation should not be required, unless he has been undiligent, to try such an issue on affidavits without the benefit of full discovery. . . . The condemnation of plaintiff's proposed further activities as a 'fishing expedition' was unwarranted.  When the fish is identified, and the question is whether it is in the pond, we know no reason to deny a plaintiff the customary license.
>
> 362 F.2d at 255-56.

The Delaware Court of Chancery addressed this issue in *Hart Holding Co.* and stated as follows:

> As a plaintiff does have an evidentiary burden, she may not be precluded from attempting to prove that a defendant is subject to the jurisdiction of the court, and may not ordinarily be precluded from reasonable discovery in aid of mounting such proof.  *Surpitski v. Hughes-Keenan Corp.*, 362 F.2d 254, 255 (1st Cir. 1966);

*see* 5A Wright and Miller § 1351 n.33.

Only where the facts alleged in the complaint make any claim of personal jurisdiction over defendant frivolous, might the trial court, in the exercise of its discretionary control over the discovery process, preclude reasonable discovery in aid of establishing personal jurisdiction. *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 708, 102 S. Ct. 2099, 2107, 72 L. Ed. 2d 492 (1982).  In *Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A. D'Assurances*, 723 F.2d 357 (3d Cir. 1983), the Court of Appeals for the Third Circuit stated the general rule:

> Where the plaintiff's claim is not clearly frivolous, the district court should ordinarily allow discovery on jurisdiction in order to aid the plaintiff in discharging that burden.

> 723 F.2d at 362.

In rare instances a court will require a plaintiff to attempt to make out its *prima facie* factual showing of defendant's amenability to suit without the benefit of discovery.  *See, e.g.*, *Wyatt v. Kaplan*, 686 F.2d 276 (5th Cir. 1982); *Daval Steel Products v. M. V. Juraj Dalmatinac*, 718 F. Supp. 159 (S.D.N.Y. 1989); *Singer v. Bell*, 585 F. Supp. 300 (S.D.N.Y. 1984); *Grove Valve & Regulator Co., Inc. v. Iranian Oil Services, Ltd.*, 87 F.R.D. 93 (S.D.N.Y. 1980).  In each of these cases the court considered matters outside of the pleadings, but found that plaintiff's assertion of personal jurisdiction lacked that minimal level of plausibility needed to permit discovery to go forward.  No purpose is here served by detailing the facts presented in those cases; questions of this kind are inherently highly particular.  But it is notable that, in *Wyatt v. Kaplan*, in approving the granting of a motion to dismiss under Rule 12(b)(2) where the plaintiff had been denied an opportunity to take depositions, the Fifth Circuit Court of Appeals strongly endorsed the practice that ordinarily permits discovery on such a motion:

> When a defendant challenges personal jurisdiction, courts generally permit depositions confined to the issues raised in the motion to dismiss. . . . In appropriate cases we will not hesitate to reverse a dismissal for lack of personal jurisdiction, on the ground that plaintiff was improperly denied discovery. . . .
>
> *Wyatt v. Kaplan*, 686 F.2d at 283."

Thus, before considering whether a prima facie showing has been made as to personal jurisdiction, Plaintiff should be allowed a fair opportunity to take jurisdictional discovery.

### IV.  Allegations in Complaint

The complaint, originally filed in the Circuit Court for Montgomery County, contains the following allegations:

1.     Plaintiff is a corporation formed under the laws of the state of Maryland, <u>maintaining its principal offices in Montgomery County</u>.  Plaintiff provides access to a computer service by multiple users, and provides Internet access to multiple users.  Plaintiff is an interactive computer service provider.

2.     Plaintiff <u>maintains its servers on Sherwood Drive in Silver Spring, Maryland,</u> and maintains its principal office at 11160 Veirs Mill Road, <u>Wheaton, Maryland</u> 20902.  Its resident agent is Alton Burton, J.D., CPA, at 9501 Anchorage Place, Bethesda, Maryland 20817.  Plaintiff provides services to <u>persons in Maryland</u>.

\*        \*        \*

10.     <u>Between April 28, 2004, and July 2, 2004 BSI received 1007 commercial e-mail messages promoting online college degrees offered by KWU</u>. On each of these occasions, and on other occasions, Defendants initiated, conspired to initiate, and assisted in the initiation of commercial electronic mail messages to recipients <u>in Maryland, including Plaintiff</u>.  By this conduct, Defendants solicited sales and conducted business <u>in Maryland</u> on a regular basis, engaged in a persistent course of conduct <u>in Maryland</u>, and availed themselves of the protection of the laws of this State.

11.     Defendants planned, prepared, designed, executed, approved, modified, condoned and ratified the sending of the electronic mail referenced above and the resulting sales.  Defendants paid others for services related to the transmissions, and received payment from advertisers and others for Defendants' services related to the transmissions.  Defendants tracked the results of the transmissions and all related services and sales.  All of these activities generated records that identify the participants in these activities, and the related times,

19

dates, quantities and payment amounts.

        12.     All of the conduct alleged above was performed either directly by Defendants or by persons acting as their agents.  Defendants participated in all of the events alleged herein, and aided, abetted, assisted, ratified, condoned and approved each others' actions, and acted as agents for each other.  All persons who participated in the events alleged above acted as agents for Defendants.

[Emphasis added.]

Thus, the complaint alleges the time frame, the receipt of emails on servers in Maryland, the quantity of the transmissions, and a description of the transmissions sufficient to place KWU on notice of the nature of the claims.  This is more than enough information to enable KWU to determine whether to admit or deny the allegations in a responsive pleading, and to pursue further detail via discovery.  The complaint adequately pleads the facts to state a cause of action. There is no requirement that the facts be pled with the degree of detail required in pleading common law fraud.  The pleading requirements are set forth in FRCP 8 as follows:

**Rule 8. General Rules of Pleading**

(a) CLAIMS FOR RELIEF. A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends, unless the court already has jurisdiction and the claim needs no new grounds of jurisdiction to support it, (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks. Relief in the alternative or of several different types may be demanded.

The complaint contains the necessary "short and plain statements" as to jurisdiction and the operative facts of the case.

## V.      Supplemental Facts

## A.  From Defendants

In an effort to show minimal contacts and lack of personal jurisdiction, KWU relies on

the Declaration of Robert Patterson to show minimal contact between KWU and Maryland, and

to show lack of liability as to the underlying claims, arguing that KWU did not commit the acts

alleged.  To the extent that KWU seeks to convert a motion to dismiss for lack of personal

jurisdiction under Rule 12(b)(2) into a motion for summary judgment, Plaintiff suggests that this

effort is inappropriate at this stage, and that any ruling based on KWU's representations as to its

minimum contacts with Maryland may not be handled like a Rule 56 motion.[6]  At this

preliminary stage of these proceedings, there has been no discovery, and Plaintiff has received no

fair opportunity to challenge the specifics in KWU's one-sided version of the facts concerning

KWU's contacts with Maryland.[7]

KWU relies on the declaration of Robert Patterson presumably to show lack of liability,

and minimal contacts with Maryland.  Interestingly, Mr. Patterson admits that KWU relies on the

use of "opt-in" e-mail lists, and admits that KWU relies on e-mail campaigns as part of its

marketing promotion.  Thus, this is not a situation where the principal was <u>unaware</u> of the use of

---

[6] Rule 12(b) provides in relevant part: "If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."  The rule does not provide for conversion of a 12(b)(2) motion into one for summary judgment by the use of affidavits or other materials outside the pleadings.

[7] Defendants were served via certified mail August 16, 2005, and responded by promptly removing the case to this Court.

bulk e-mail as a means of marketing; rather, the principal simply wished that the individuals who were authorized to engage in this type of marketing would do so carefully and within certain guidelines.  This is analogous to Federal Express urging its drivers to adhere to company guidelines, and to exercise reasonable care in fulfilling their duties.  It is contemplated that the drivers will actually use the instrumentality of a motor vehicle to deliver packages, just as KWU contemplated that its marketers would use bulk e-mail to deliver its messages.  The only difference is that the use of bulk e-mail is notoriously offensive to the public, to the extent that most states have now passed statutes regulating this practice and imposing serious fines and civil remedies for violations involving the transmission of unsolicited e-mail, or in the case of Maryland, the transmission of e-mail containing false or misleading information in the subject lines, or in the path of origin.

Mr. Patterson's declaration takes pains to argue that KWU is  "CAN-SPAM compliant." The instant suit was not filed under CAN-SPAM, but rather,  MCEMA.  The criteria for violations of the two statutes are different.

Mr. Patterson acknowledges that "thirty-two Maryland residents have <u>graduated</u> from a KWU course of study." [Emphasis added.]  He does not say how many persons having a Maryland address have <u>started</u> or <u>applied for</u>, a course of study with KWU, or how many have inquired in response to an advertisement. Further, he does not indicate how much revenue has been derived by KWU from any services performed for Maryland residents.  Conveniently, he also ignores the point that KWU advertises faculty based in Maryland.

### B.  Supplemental Facts from Plaintiff

Because Plaintiff does not have access to key internal information about KWU's operations without the benefit of discovery, Plaintiff must rely on publicly accessible information, much of it obtained via the Internet.  Plaintiff also relies on the Affidavit of Paul A. Wagner, which states basic facts regarding Plaintiff's business and its receipt of the emails at issue, and the Expert Witness Report of Paul A. Wagner, both of which are filed contemporaneously with this opposition.

In addition to Plaintiff's receipt of over 1,000 e-mails promoting KWU's activities as alleged in the complaint, Plaintiff's exhibits demonstrate KWU's ongoing efforts to solicit business in Maryland and its faculty here.  KWU is featured in online listings for "Maryland Colleges and Universities" at 50states.com (Exhibit 9),  "Maryland Colleges, Schools and Universities" at Sleuth.com (Exhibit 10), "Maryland Trade Schools, Colleges and Universities Directory" on Beelineweb.com (Exhibit 11),  "Maryland Health Care Schools" on www.health-care-careers.com (Exhibit 12) and "Maryland E-Business Degrees" at www.education-online-search.com (Exhibit 13), all examples of obvious efforts to generate business for KWU in Maryland.   Each of these sites is a forum for paid advertisers, some of them offering top position for higher advertising fees.  Thus, KWU may pay top dollar to be listed near the top of these online directories.  Discover is needed to obtain the details.

Plaintiff's Exhibits 14, 15 and 16 show among the KWU faculty, "Dahli Gray, D.B.A., Business Administration, Timonium Maryland, Morgan State University;" and "Michael J. Mason, PhD, Education/Psychology, Gaithersburg, Maryland, Georgetown University."

According to Exhibit 15, an excerpt from the website of KWU, Dr. Dahli Gray "has taught a diverse array of courses at the graduate and undergraduate level both in traditional face to face and online classrooms.  At KWU, Dr. Dahli Gray assists students enrolled in various programs including finance, management, business administration, leadership, research, communication and other related disciplines."  The same website includes the following commentary on Michael J. Mason, PhD: "Dr. Mason also provides child, adolescent and family clinical services through the department of psychology outpatient practice.  At KWU, Dr. Mason assists students enrolled in Health Administration, Human Resource Management, and Management and Leadership courses."  Also, as noted in the Expert Report of Paul A. Wagner, in a specific reference to Exhibit 17, another excerpt from the KWU online advertisements, KWU has an interactive form that accepts inquiries from residents of the State of Maryland, but expressly states, "KWU cannot accept inquiries from California and Oregon residents at this time."  Thus, the interactive solicitation of business via the Internet is not a blanket form applicable to all states; it specifically excludes some and allows others, including Maryland.

KWU solicits business via interactive websites that provide commissions of "$8.00 per lead."  Exhibit 19.  The Patterson Declaration does not mention the existence of these "bounty" referral sources, or the number of such referring sources in Maryland.  The Declaration is likewise silent on the number of abuse reports concerning bulk email that have been sent by recipients in Maryland.  See Exhibit 22.

Plaintiff would like to explore how many persons having a Maryland address have started or applied for, a course of study with KWU, how many have inquired in response to an advertisement; the amount of revenue KWU has derived from any services performed for

Maryland residents and the total number of KWU faculty in Maryland over the past 5 years.

KWU operates an interactive Web site that conducts customer support, provides a personal "Admissions Counselor"with whom one can speak, an online "application," a program "evaluator," and an online multimedia demonstration of KWU "library services and learning resources available to [customers]"– all without regard whether the customer is in Maryland or not. [Exhibit 23.]  Through this interactive web site, KWU's server(s) and personnel interact with persons in Maryland.  The extent of such services provided to Marylanders is obviously relevant to personal jurisdiction.

KWU states that numerous corporations reimburse for its tuition.  [Exhibit 25] The link labeled "Click here" on Exhibit 25 leads to Exhibit 26, in which KWU lists 25 specific Maryland entities. [Exhibit 26]

KWU advertises in the Verizon SuperPages for the Baltimore, MD region [Exhibit 28], and in the Baltimore Maryland Yellow Pages under "computer programming searvices."  [Exhibit 29]   Exhibit 29 shows that KWU has a paid advertisement (not a mere listing) targeting the state of Maryland, second in prominence (position) only to Earthlink's.  Exhibit 30 explains how the paid positioning works. To gain top position, KWU has "bid against other merchants who are targeting thesame category and location" so as to get "the best placement for the best price" for that specific region (Maryland). Every click-through results in a charge by Verizon to KWU.

Thus, KWU has multiple contacts with Maryland not addressed in Mr. Patterson's Declaration, that either suffice to create minimum contacts for purposes of personal jurisdiction, or invite close scrutiny via discovery before this issue is decided.

## VI.  CAN SPAM does not pre-empt the MCEMA claims in this suit.

CAN SPAM (15 USC §7701) does not preempt state statutes to the extent they are based on conduct that is fraudulent or deceptive.  The claims in the instant case are based specifically on deceptive, false and misleading conduct.

The Supreme Court has stated, with respect to federal-state preemption, "[W]hen Congress has 'unmistakably... ordained,' that its enactments alone are to regulate apart of commerce, state laws regulating that aspect of commerce must fall . . ." Jones v. Rath Packing Co., 430 US 519, 525 (1977).

CAN-SPAM provides in relevant part:

15 USC §7701
SEC. 8. EFFECT ON OTHER LAWS.

(a) FEDERAL LAW
  (1) Nothing in this Act shall be construed to
  impair the enforcement of section 223 or 231 of the
  Communications Act of 1934 (47 U.S.C. 223 or 231,
  respectively), chapter 71 (relating to obscenity) or 110
  (relating to sexual exploitation of children) of title 18,
  United States Code, or any other Federal criminal statute.

  (2) Nothing in this Act shall be construed to affect in any
  way the Commission's authority to bring enforcement actions
  under FTC Act for materially false or deceptive
  representations or unfair practices in commercial electronic
  mail messages.

(b) STATE LAW-

> (1) IN GENERAL- This Act supersedes any statute,
> regulation, or rule of a State or political subdivision
> of a State that expressly regulates the use of
> electronic mail to send commercial messages, <u>except to
> the extent that any such statute, regulation, or rule
> prohibits falsity or deception in any portion of a
> commercial electronic mail message or information
> attached thereto</u>.

15 USC  §7701

[Emphasis added.]

The issue becomes whether MCEMA prohibits "falsity or deception."  It does.[8]

## VII.  MCEMA is not unconstitutional

### A.  Dormant Commerce Clause

MCEMA was passed by the Maryland legislature after consideration of the Washington

State anti-spam statute (Washington Commercial Electronic Mail Act, chapter 19.190 RCW),

which was addressed by the Washington Supreme Court in <u>State v. Heckel</u>, 143 Wash. 2d 824,

---

[8] MCEMA:  §14-3002.  . . .  (b)  A person may not initiate the transmission, conspire with another person to initiate the transmission, or assist in the transmission of commercial electronic mail that:  (1)  is from a computer in the state or is sent to an electronic mail address that the sender knows or should have known is held by a resident of the state; and (2) (i)  uses a third party's internet domain name or electronic mail address without the permission of the third party; (ii)  contains <u>false or misleading information</u> about the origin or the transmission path of the commercial electronic mail; or (iii)  contains <u>false or misleading information</u> in the subject line that has the capacity, tendency, or effect of deceiving the recipient. (c)  a person is presumed to know that the intended recipient of   commercial electronic mail is a resident of the state if the information is available on request from the registrant of the internet domain name contained in the recipient's electronic mail address. [Emphasis added.]

24 P.3d 404 (2001).  The court concluded that the Washington Statute did not violate the dormant commerce clause of the U.S. Constitution, and reversed the lower courts' findings on this issue.  The Maryland legislature relied on the <u>Heckel</u> analysis in deciding to pass MCEMA.

There are currently at least three cases on appeal before the Maryland Court of Special Appeals in which the constitutionality of MCEMA under the dormant commerce clause of the constitution is at issue.  Those cases are <u>MaryCLE v.First Choice Internet, Inc.</u>, CSA No. 2321, September Term, 2004 (argued October 12, 2005); <u>Beyond Systems, Inc. v. SecureMedical, Inc.</u>, CSA No. 02783, September Term, 2004; and <u>Beyond Systems, Inc., v. .Aesop Marketing Corporation, et al</u>, CSA No. 530, September Term, 2005.  All three of these cases were decided by the same Circuit Court judge.

The rationale stated in <u>Heckel</u>[9] rebuts the commerce clause challenge.  MCEMA is nearly identical to the Washington statute. The analysis in <u>Heckel</u>, should prevail here.

Article I, § 8, Clause 3 of the United States Constitution grants to Congress the power to regulate interstate commerce.  From that clause is derived a negative implication, known as the "dormant" Commerce Clause, to the effect that, even in situations in which Congress has not acted either affirmatively to regulate an interstate activity or specifically to bar the States from doing so, its very power to regulate precludes the States from acting in ways that would burden

_____

[9] <u>Heckel</u> is cited in <u>MaryCLE v.First Choice Internet, Inc.</u>, 2004 WL 2895755, December 9, 2004, Circuit Court for Montgomery County, No. 248514-V, Judge Durke Thompson, on appeal as CSA No. 2321, September Term, 2004.  However, Judge Thompson found <u>Heckel's</u> ruling on commerce clause constitutionality inapplicable, due to differences in the <u>facts</u> of the two cases.  He concluded that in <u>Heckel</u>, "the actions [emails] took place within the [forum] state of Washington . . ." but that in MaryCLE the emails "were sent from New York, routed through Virginia and Colorado, and finally were received in Washington, D.C."

interstate commerce.

Although the force of that negative implication flowed and ebbed in early Supreme Court jurisprudence, the Court, in Southern Pacific Co. v. Arizona, 325 U.S. 761, 65 S. Ct. 1515, 89 L. Ed. 1915 (1945), struck a balance, noting that, in the absence of conflicting legislation by Congress, there is "a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it." Id. at 767, 65 S. Ct. at 1519, 89 L. Ed. at 1923. The Court later defined the balance as follows:

> "Although the criteria for determining the validity of state statutes affecting interstate commerce have been variously stated, the general rule that emerges can be phrased as follows: Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."
>
> Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S. Ct. 844, 847, 25 L. Ed. 2d 174, 178 (1970)

In Heckel, the State of Washington sued Oregon resident Jason Heckel, alleging that his transmissions of email to Washington residents violated the Washington statute. The trial court granted summary judgment for Heckel, finding that the Act violated the Commerce Clause (U.S. Const. art. I, sec. 8, cl. 3) and was "'unduly restrictive and burdensome.'" The issue on appeal was, "Does the Act, which prohibits misrepresentation in the subject line or transmission path of any commercial e-mail message sent to Washington residents or from a Washington computer, unconstitutionally burden interstate commerce?"

The Commerce Clause grants Congress the "power . . . {t}o regulate commerce with foreign nations, and among the several states." U.S. Const. art. I, sec. 8, cl. 3. Implicit in this affirmative grant is the negative or 'dormant' Commerce Clause--the principle that the states impermissibly intrude on this federal power when they enact laws that unduly burden interstate commerce.  Analysis of a state law under the dormant Commerce Clause generally follows a two-step process. The court first determines whether the state law openly discriminates against interstate commerce in favor of intrastate economic interests. If the law is facially neutral, applying impartially to in-state and out-of- state businesses, the analysis moves to the second step, a balancing of the local benefits against the interstate burdens.  Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S. Ct. 844, 25 L. Ed. 2d 174 (1970)).

The Washington court found that the Washington statute was not facially discriminatory. It applies evenhandedly to in-state and out-of-state emailers: 'No person' may transmit the proscribed commercial e-mail messages 'from a computer located in Washington or to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident.' RCW 19.190.020(1) (emphasis added). Just as the statute applied to Heckel, an Oregon resident, it was enforceable against a Washington business engaging in the same practices.

Under the <u>Pike</u> balancing test, "{i}f a legitimate local purpose is found, then the question becomes one of degree." 397 U.S. at 142. In <u>Heckel</u>, the trial court questioned whether the Washington statute's requirement of truthfulness (in the subject lines and header information) would redress the costs associated with bulk e-mailings. As legal commentators have observed, however, "the truthfulness requirements (such as the requirement not to misrepresent the message's Internet origin) make spamming unattractive to the many fraudulent spammers, thereby reducing the volume of spam." Jack L. Goldsmith & Alan O. Sykes, The Internet and the Dormant Commerce Clause, 110 Yale L.J. 785, 819 (2001). Calling "simply wrong" the trial court's view "that truthful identification in the subject header would do little to relieve the annoyance of spam," the commentators assert that "{t}his identification alone would allow many people to delete the message without opening it (which takes time) and perhaps being offended by the content." Id. The statute's truthfulness requirements thus appear to advance the statute's aim of protecting ISPs and consumers from the problems associated with commercial bulk e-mail.

To be weighed against the Washington statute's local benefits, the only burden placed on spammers is the requirement of truthfulness, a requirement that does not burden commerce at all but actually 'facilitates it by eliminating fraud and deception.' Id. Spammers must use an accurate, nonmisleading subject line, and they must not manipulate the transmission path to disguise the origin of their commercial messages. While spammers incur no costs in complying with the Act, they do incur costs for noncompliance, because they must take steps to introduce forged information into the header of their message. (<u>Heckel</u>, fn. 12)

In finding the Washington statute "'unduly burdensome," the <u>Heckel</u> trial court apparently

31

focused not on what spammers must do to comply with the Act but on what they must do if they choose to use deceptive subject lines or to falsify elements in the transmission path. To initiate deceptive spam without violating the Act, a spammer must weed out the state's residents by contacting the registrant of the domain name contained in the recipient's e-mail address. (Heckel, fn. 13)  This focus on the burden of noncompliance is contrary to the approach in the Pike balancing test, where the United States Supreme Court assessed the cost of compliance with a challenged statute. 397 U.S. at 143. Indeed, the Heckel trial court could have appropriately considered the filtering requirement a burden only if Washington's statute had banned outright the sending of UCE messages to Washington residents.  The Supreme Court of Washington therefore concluded that Mr. Heckel had failed to prove that "the burden imposed on . . . commerce {by the Act} is clearly excessive in relation to the putative local benefits." Pike,  397 U.S. at 142.

Heckel argued that the Act created inconsistency among the states and regulated conduct occurring wholly outside of Washington, thus drawing on two 'unsettled and poorly understood' aspects of the dormant Commerce Clause analysis, which are facets of the Pike balancing test. (Heckel, fn.15)  The court in Heckel found that the Washington statute survives both inquiries, noting that 17 other states have passed legislation regulating electronic solicitations (Heckel, fn.16), and that the truthfulness requirements of the Washington statute do not conflict with any of the requirements in the other states' statutes. Some states' statutes do include additional requirements; for example, some statutes require spammers to provide contact information (for opt-out purposes) or to introduce subject lines with such labels as "ADV" or "ADV-ADLT." But because such statutes 'merely create additional, but not irreconcilable, obligations, "they are not

considered to be inconsistent'" for purposes of the dormant Commerce Clause analysis.

Instructional Sys., Inc. v. Computer Curriculum Corp., 35 F.3d 813, 826 (3d Cir. 1994). The

inquiry under the dormant Commerce Clause is not whether the states have enacted different

anti-spam statutes but whether those differences create compliance costs that are 'clearly

excessive in relation to the putative local benefits.' Pike, 397 U.S. at 142. For these reasons, the

Heckel court did not believe that the differences between the Washington statute and the anti-

spam laws of other states impose extraordinary costs on businesses deploying spam.  (Heckel,

fn.17)

    The statute creates no 'sweeping extraterritorial effect' that would outweigh its local

benefits.  Edgar v. MITE Corp., 457 U.S. 624, 642, 102 S. Ct. 2629, 73 L. Ed. 2d 269 (1982). In

the MaryCLE case the Circuit Court found that the plaintiff was a Maryland corporation having

little physical presence in Maryland, seeking to enforce the statute against out-of-state

defendants.  The plaintiff's lack of presence in the state diluted the defendants' contacts with

Maryland because the plaintiff retrieved the messages from out of state.  However, the Maryland

statute does not burden interstate commerce by regulating when or where recipients may open the

proscribed UCE messages.  Rather, as noted by the Heckel court, the statute addresses the

conduct of spammers in targeting Maryland consumers. As noted in Heckel, "the hypothetical

mistakenly presumes that the Act must be construed to apply to Washington residents when they

are out of state, a construction that creates a jurisdictional question not at issue in this case."

This comports with Plaintiff's view: the issue raised by remote retrieval of messages by

Maryland residents who choose to retrieve emails while out of state creates a question of

personal jurisdiction, not of constitutionality under the dormant Commerce Clause.

The <u>Heckel</u> court rejected arguments based on <u>American Libraries Association v. Pataki</u>, 969 F. Supp. 160 (S.D.N.Y. 1997), the first decision first to apply the dormant Commerce Clause to a state law on Internet use.  (<u>Heckel</u>, fn.18)  At issue in <u>American Libraries</u> was a New York statute that made it a crime to use a computer to distribute harmful, sexually explicit content to minors. The statute applied not just to initiation of e-mail messages but to all Internet activity, including the creation of websites. Thus, under the New York statute, a website creator in California could inadvertently violate the law simply because the site could be viewed in New York. Concerned with the statute's "chilling effect," id. at 179, the court observed that, if an artist "were located in California and wanted to display his work to a prospective purchaser in Oregon, he could not employ his virtual {Internet} studio to do so without risking prosecution under the New York law." Id. at 174.

In contrast to the New York statute, which could reach all content posted on the Internet and therefore subject individuals to liability based on unintended access, the Washington statute reaches only those deceptive UCE messages directed to a Washington resident or initiated from a computer located in Washington; in other words, the statute does not impose liability for messages that are merely routed through Washington or that are read by a Washington resident who was not the actual addressee.   The same analysis applies to the Maryland statute.

**Deception by bulk emailers.**

The facts in <u>Heckel</u> are worthy of review because they shed light on the insidious and deceptive nature of bulk email in Internet marketing, relevant to the instant case.  Jason Heckel, an Oregon resident doing business as Natural Instincts, began sending unsolicited commercial e-

mail (UCE), or "spam," over the Internet in 1996.  In 1997, Heckel developed a 46- page on-line

booklet entitled "How to Profit from the Internet." The booklet described how to set up an

on-line promotional business, acquire free e-mail accounts, and obtain software for sending bulk

e-mail. From June 1998, Heckel marketed the booklet by sending between 100,000 and

1,000,000 UCE messages per week. He used Extractor Pro, a software program, to harvest e-mail

addresses from various on-line sources and then directed bulk-mail messages. Extractor Pro

requires the sender to enter a return e-mail address, a subject line, and the text of the message to

be sent. The text of Heckel's UCE was a lengthy sales pitch that included testimonials from

satisfied purchasers and culminated in an order form that the recipient could download and print.

The order form included the Salem, Oregon, mailing address for Natural Instincts. Charging

$39.95 for the booklet, Heckel made 30 to 50 sales per month.

In June 1998, the Consumer Protection Division of the Washington State Attorney

General's Office received complaints from Washington recipients of Heckel's UCE messages,

alleging that the messages contained misleading subject lines and false transmission paths. CPD

sent Heckel a warning letter.  Nevertheless, the Attorney General's Office continued to receive

consumer complaints alleging that Heckel's bulk e-mailings from Natural Instincts appeared to

contain misleading subject lines, false or unusable return e-mail addresses, and false or

misleading transmission paths. Between June and September 1998, the Consumer Protection

Division of the Attorney General's Office documented 20 complaints from 17 recipients of

Heckel's UCE messages.  On October 22, 1998, the State filed suit against Heckel for using false

or misleading information in the subject line of the emails, by providing misleading information

defining their transmission paths, and by failing to provide a valid return email address.

Of the 20 complaints the Attorney General's Office received concerning Heckel's spam, 9 of the messages showed '13.com' as the initial transmitting ISP.  The 13.com domain name, however, was registered as early as November 1995 to another individual, from whom Heckel had not sought or received permission to use the registered name. Heckel used at least a dozen different return e-mail addresses with the domain name 'juno.com,' none of which was readily identifiable as belonging to Heckel.  The user names that he registered generally consisted of a name or a name plus a number (e.g., 'marlin1374,' 'cindyt5667,' 'howardwesley13,' 'johnjacobson1374,' and 'sjtowns').

When Heckel's Juno email addresses were canceled for sending bulk e-mails, he would simply open a new account and continue with another bulk mailing. Because Heckel's accounts were canceled rapidly, recipients who attempted to reply were unsuccessful. The State thus contended that Heckel's practice of cycling through e-mail addresses ensured that those addresses were useless to the recipients of his UCE messages.  During the months that Heckel was sending out bulk e-mail solicitations on the Juno accounts, he maintained a personal e-mail account from which he sent no spam, but that e-mail address was not included in any of his spam messages. The State asserted that Heckel's use of such ephemeral e-mail addresses in his UCE amounted to a deceptive practice in violation of the state consumer protection act.

**Spam causes harm and merits regulation**.

The harm caused by mass e-mailers is well recognized:

". . . [A]ny value CompuServe realizes from its computer equipment is wholly derived from the extent to which that equipment can serve its subscriber base. . . . {H}andling the enormous volume of mass mailings that CompuServe receives places a tremendous burden on its equipment. Defendants' more recent practice of

36

> evading CompuServe's filters by disguising the origin of their messages
> commandeers even more computer resources because CompuServe's computers
> are forced to store undeliverable e-mail messages and labor in vain to return the
> messages to an address that does not exist. To the extent that defendants'
> multitudinous electronic mailings demand the disk space and drain the processing
> power of plaintiff's computer equipment, those resources are not available to serve
> CompuServe subscribers. Therefore, the value of that equipment to CompuServe
> is diminished even though it is not physically damaged by defendants' conduct.

CompuServe Inc. v. Cyber Promotions, Inc., 962 F. Supp. 1015, 1022 (S.D. Ohio 1997)

(citations omitted)  (granting preliminary injunction against bulk e-mailer on theory of trespass to

chattels); see also America Online, Inc. v. IMS, 24 F. Supp. 2d 548, 550 (E.D. Va. 1998) (relying

on the reasoning of CompuServe' and finding that bulk e-mailer "injured AOL's business

goodwill and diminished the value of its possessory interest in its computer network"). To handle

the increased e-mail traffic attributable to deceptive spam, ISPs must invest in more computer

equipment. Operational costs likewise increase as ISPs hire more customer service

representatives to field spam complaints and more system administrators to detect accounts being

used to send spam.

The Heckel court also noted that along with ISPs, the owners of impermissibly used

domain names and e-mail addresses suffer economic harm. For example, the registered owner of

'localhost.com' alleged that his computer system was shut down for three days by 7,000 responses

to a bulk-mail message in which the spammer had forged the e-mail address

'nobody@localhost.com' into his spam's header. Seidl v. Greentree Mortgage Co., 30 F. Supp. 2d

1292, 1297-98 (D. Colo. 1998); see also Spamming: The E-Mail You Want to Can: Hearing

Before the Subcomm. on Telecommunications, Trade, and Consumer Protection of the Comm.

on Commerce, 106th Cong. 9 (1999) (statement of Rep. Gary G. Miller); 146 Cong. Rec. H6373 (daily ed. July 18, 2000) (statement of Rep. Miller), available at http://thomas.loc.gov/home/ c106query.html (recounting similar experience of California constituent).

The <u>Heckel</u> court found that deceptive spam harms individual Internet users as well. When a spammer distorts the point of origin or transmission path of the message, e-mail recipients cannot promptly and effectively respond to the message (and thereby opt out of future mailings); their efforts to respond take time, cause frustration, and compound the problems that ISPs face in delivering and storing the bulk messages. And the use of false or misleading subject lines further hampers an individual's ability to use computer time most efficiently. When spammers use subject lines 'such as 'Hi There!,' 'Information Request,' and 'Your Business Records,'' it becomes 'virtually impossible' to distinguish spam from legitimate personal or business messages. Individuals who do not have flat-rate plans for Internet access but pay instead by the minute or hour are harmed more directly, but all Internet users (along with their ISPs) bear the cost of deceptive spam.

This cost-shifting--from deceptive spammers to businesses and e-mail users- -has been likened to sending junk mail with postage due or making telemarketing calls to someone's pay-per-minute cellular phone.  In a case involving the analogous practice of junk faxing (sending unsolicited faxes that contain advertisements), the Ninth Circuit acknowledged 'the government's substantial interest in preventing the shifting of advertising costs to consumers.' <u>Destination Ventures, Ltd. v. F.C.C.</u>, 46 F.3d 54, 56 (9th Cir. 1995) (holding that the restrictions of the Telephone Consumer Protection Act (47 U.S.C. sec. 227) on commercial speech did not violate the First Amendment). Thus, anti-spam statutes serve the 'legitimate local purpose' of

banning the cost-shifting inherent in the sending of deceptive spam.

### B. Vagueness

KWU argues that MCEMA is unconstitutional because it is unreasonably vague. This argument is off the mark because the key allegations in this case are based on falsity rather than mere deception.

The mere fact that thought is required to apply the statute to a particular set of facts, does not render a statute void for vagueness. The key words at issue ("false or misleading") are not so obscure that persons of common intelligence cannot determine their meaning. These words are used in dozens of other Maryland statutes without a constitutionality problem. In the Luskins opinion applying similar language, the court upheld an objective standard as to deception: the test is whether a reasonable consumer would have been deceived. There is no reason to use any other standard given the guidance in Luskins.

The vagueness doctrine is "rooted in the fourteenth amendment's guarantee of procedural due process); *Eanes v. State*, 318 Md. 436, 459, 569 A.2d 604, 615 (1990) (vagueness is "based on fourteenth amendment due process or fairness concerns"), *cert. denied*, 496 U.S. 938, 110 S.Ct. 3218, 110 L. Ed. 2d 665; *see also* LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW (2d. 1988) § 10-8, at 684 ("Life, liberty and property could not, furthermore, be taken by virtue of a statute shows terms were 'so vague, indefinite and uncertain' that one cannot determine their meaning." (footnote omitted)); *id*. § 12-31, at 1033 "As a matter of due process, a law is void on its face if it is so vague that persons 'of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v.*

39

*General Construction Co.*, 269 U.S. 385, 391, 46 S. Ct. 126, 70 L. Ed. 322 (1926).

The party attacking the statute has the burden of establishing its unconstitutionality.

*Beauchamp*, 256 Md. at 547, 261 A.2d at 463 (citing *National Can Corp. v. State Tax Comm'n*,

220 Md. 418, 153 A.2d 287 (1959), *appeal dismissed*, 316 U.S. 534, 80 S. Ct. 586, 4 L. Ed. 2d

538 (1960).  KWU has failed to meet its burden here.

**V. Conclusion**

The allegations and supporting materials show the necessary minimum contacts for

personal jurisdiction over KWU.  In the alternative, Plaintiff should be permitted jurisdictional

discovery before any dismissal for lack of personal jurisdiction.  CAN-SPAM does not preempt

the MCEMA claims based on falsity and deception.  MCEMA is not unconstitutional under the

Dormant Commerce Clause or due to vagueness.  For all of the above reasons, Plaintiff requests

that the Motion to Dismiss be denied.

STEPHEN H. RING, P.C., by


_____/s/_____

Stephen H. Ring

316 East Diamond Avenue, Suite 102

Gaithersburg, Maryland 20877

MD Bar Id. No. 04731764

Telephone: 301-990-4840

Attorney for Plaintiff